RAFAEL M. GONZALEZ, JR.
ACTING UNITED STATES ATTORNEY
JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 WEST MYRTLE STREET, SUITE 500
BOISE, ID 83702
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-1413

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>vs.<br><br>DOUGLAS ARNOLD WOLD,<br><br>Defendant. | Case No. 1:20-CR-00202-S-DCN<br><br>**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM** |

The United States of America, by and through Rafael M. Gonzalez, Jr., Acting United States Attorney for the District of Idaho, and Joshua D. Hurwit, the undersigned Assistant United States Attorney, submits the following memorandum setting forth the Government's position at sentencing. The Government recommends that the Court sentence the defendant to a sentence of imprisonment of 41 months, the high-end of the guidelines range. The Government also asks the Court to impose a term of supervised release of three years and order the special assessment of $300. The Government is not seeking a fine, but asks the Court to impose restitution in the

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 1**

amount to be determined at sentencing, which, as discussed below, the Government presently submits should be at least $123,347.

## BACKGROUND

On September 10, 2020, the Defendant was charged with (i) 11 counts of wire fraud, in violation of 18 U.S.C. § 1343, (ii) one count of mail fraud, in violation of 18 U.S.C. § 1341, and (iii) one count of money laundering (engaging in a monetary transaction in property derived from specified unlawful activity), in violation of 18 U.S.C. § 1957.

On May 18, 2021, pursuant to a plea agreement, the Defendant pleaded guilty to Count One (wire fraud), Count Twelve (mail fraud), and Count Thirteen (money laundering) and admitted to the forfeiture allegations in the Indictment. The Government has agreed to dismiss the other counts against the Defendant at sentencing.

## LEGAL ANALYSIS

The Ninth Circuit has set forth a basic framework that district courts should follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

(1) Courts are to begin all sentencing proceedings by correctly determining the applicable sentencing guidelines range, precisely as they would have before *Booker*.

(2) Courts should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties. Courts may not presume that the guidelines range is reasonable. Nor should the guidelines factors be given more or less weight than any other. The guidelines are simply to be treated as one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.

(3) If a court decides that a sentence outside the guidelines is warranted, then it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

(4) Courts must explain the selected sentence sufficiently to permit meaningful appellate review.

*United States v. Carty*, 520 F.3d 984, 991-92 (9th Cir. 2008).

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 2**

**SENTENCING CALCULATION**

**I.    Statutory Maximum and Minimum Sentence**

The offenses of wire fraud and mail fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively, are punishable by up to 20 years in prison, a term of supervised release of 3 years, a maximum fine of $250,000, and a special assessment of $100.

The offense of engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957, is punishable by up to 10 years in prison, a term of supervised release of 3 years, a maximum fine of $250,000, and a special assessment of $100.

**II.    United States Sentencing Guidelines Calculation**

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

    **A.    Offense Level Calculation**

Probation calculated the offense level in this case to be 16. The Government agrees.

    **B.    Criminal History Calculation**

Probation calculated the defendant's criminal history to be Category IV. The Government agrees.

    **C.    Advisory Guidelines Range**

Based on the foregoing, the guidelines range in this case is 36 to 41 months.

# IMPOSITION OF SENTENCE

I. **Imposition of a Sentence under 18 U.S.C. § 3553**

   A. **18 U.S.C. § 3553(a) factors**

      1. <u>The nature and circumstances of the offense</u>

This case reflects the Defendant's decision to take his pattern of fraud to another level. As reflected in the Presentence Investigation Report ("PSR"), and as outlined in more detail below, the Defendant has previously committed several theft and fraud offenses that were prosecuted at the state level. He most recently got out of prison in 2016, and, in June 2019, despite his past, he was able to get a good job as a human resources manager at Fry Foods, Inc. As the victim-impact statements from Fry Foods' employees and its owner make clear, Fry Foods made the mistake of trusting the Defendant. And he took Fry Foods for a ride, stealing (and attempting to steal) over $150,000.

As bad as that is, the Defendant's conduct is even more egregious because he committed his crimes in the middle of the Covid-19 pandemic when Fry Foods, Inc. was particularly vulnerable and stretched to a breaking point due to the pandemic.

The Defendant committed two frauds: a payroll fraud scheme and a Covid testing fraud scheme. First, with respect to the payroll scheme, the Defendant stole by using his role in the payroll process to embezzle money from Fry Foods. Fry Foods used a third-party accounting firm to cut its payroll checks, and, as part of his role at Fry Foods, the Defendant would submit the payroll requests to this firm and often pick up the checks to be delivered to employees. In May 2000, the Defendant began to take advantage of this process. He submitted fraudulent check requests to the accounting firm in the name of employees who no longer worked at Fry Foods or who had never worked at Fry Foods. Once these fraudulent checks were issued, the Defendant took them and deposited them primarily into an account for a business he had set up.

**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM - 4**

From there, he transferred the funds into personal accounts and into those of his family members. He used a significant portion of his ill-gotten gains to purchase an expensive speedboat and trailer.

The Defendant's second scheme related to Covid testing, and context is important. In May 2020, Fry Foods endured a Covid outbreak at its Weiser plant, where the Defendant had responsibility. The plant closed for a time, 260 employees were furloughed, and the Defendant was even quoted in an article about the outbreak. https://www.malheurenterprise.com/posts/7147/fry-foods-weiser-plant-shuts-down-after-employees-test-positive-for-covid-19 (last visited Nov. 9, 2021). This Covid crisis apparently gave the Defendant a new idea of how he could bilk his employer out of even more money. He invented a new company—Hala Lallo Health—which he alone controlled. In July 2020, the Defendant arranged for Fry Foods to pay the inflated amount of $39,995.00 to Hala Lallo Health for Covid testing for its employees. The Defendant knew that Hala Lallo Health has no capabilities to test employees and he knew that the costs of testing Fry Foods employees was only about $10,000. So, the Defendant arranged for a true community health provider to test Fry Foods' employees but caused Fry Foods to issue a check to Hala Lallo Health for $39,995.00. The Defendant pocketed this check. To top it all off, the Defendant didn't even pay the true testing company, something that Fry Foods had to do later when the scheme was discovered.

The Defendant's final offense was money laundering: he used the proceeds of his crimes to engage in a further financial transaction. In this case, that transaction was not to pay off debt or to support a family member in need—not excusable, to be sure, but a different type of motivation than greed. Rather, the Defendant spent the majority of his ill-gotten gains—

$69,116.48—on a very nice speedboat and trailer. The Government has since seized the speedboat and trailer and sold them.

In sum, the Defendant committed very serious crimes. He not only cost his employer a lot of money, but he also deeply affected the mental well-being and professional confidence of colleagues that had trusted him. That the Defendant took advantage of the pandemic to complete at least a portion of his crimes demonstrates the type of individual who is before this Court. The nature of the Defendant's offenses justifies a high-end sentence.

2. <u>History and characteristics of the defendant</u>

The Defendant has a lengthy criminal history that started when he was a teenager and has continued unabated. He possessed stolen property when he was 15 (PSR ¶ 24), committed grand theft when he was 17 (PSR ¶ 35), committed petit theft when he was 18 (PSR ¶ 40), and committed theft when he was 19 (PSR ¶ 44). After receiving short jail sentences for some of those crimes, the Defendant graduated to forgery at the age of 19. (PSR ¶ 46.) At age 20, he was convicted for writing bad checks and received a suspended sentence of six months in jail. (PSR ¶ 57.) At age 23, he was back to grand theft, receiving another suspended sentence. (PSR ¶ 60.) Undeterred, the Defendant committed check forgery again at age 25. (PSR ¶ 61.)

About 10 years later, the Defendant took things up another notch. In 2007, at age 35, he committed arson as part of an insurance fraud scheme. (PSR ¶ 62.) In 2012, he committed grand theft, receiving what appears to be his first lengthy prison sentence. (PSR ¶ 63.) He was released in 2016, had a chance to remake his life, including with the opportunity at Fry Foods, but fell back into his pattern of fraud, theft, and deceit by committing the offenses in this case.

The Defendant has created a record for himself that forecloses the types of arguments for leniency that are often proffered at sentencing:

- This is not the Defendant's first theft or fraud conviction. So the Defendant's opportunity at sentencing to express remorse for his victim should be viewed in the context of his repeated actions, not his words.

- This is not the Defendant's first time facing a significant prison sentence. So the Defendant's unwillingness to use his previous sentences to start fresh weighs in favor of the Government's recommended sentence

- And this is not a disadvantaged defendant who never had support system or a reason to change. The Defendant has had family support and was given a golden opportunity to contribute to his family and society through a good job at Fry Foods. He rejected that opportunity out of greed.

In sum, the Defendant is a serial fraudster who, while accepting responsibility for his actions in this case, has shown no ability to lead an honest life. This justifies a high-end sentence in this case.

> 3. <u>The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; and the need for the sentence imposed to afford adequate deterrence and to protect the public.</u>

A high-end sentence is sufficient but not greater than necessary to satisfy the remaining sentencing factors under § 3553(a)(2).

For the reasons discussed above, a high-end sentence reflects the seriousness of the offense and the fact that one of the Defendant's crimes involved taking advantage of the Covid crisis to enrich himself.

As to promoting respect for the law and specific deterrence, the Government has no allusions that the Defendant will, all-of-a-sudden, become a law-abiding citizen. Certainly, that is hoped for, but given the Defendant's record and his conduct in this case, the Government feels

that it has no option but to recommend a high-end sentence.  The more time that the Defendant has to think about his crimes while in custody, the better his chances of success once released.

And this brings up a factor that the Government rarely addresses in a white-collar case: the protection of the public.  Usually, when a fraudster is caught and sentenced, there is only a general concern for recidivism.  Here, however, that concern is particularly acute and is established by the Defendant's many convictions and periods of incarceration.  Nothing has seemed to steer the Defendant to a better path, including Fry Foods' belief and trust in him.  At this point, the appropriate outcome is to separate him from society—for purposes of the protecting the public from fraud—for as long as the guidelines recommend, which is 41 months.

Finally, the Court should also consider general deterrence.  As the Defendant has demonstrated with zeal, people in positions of trust (*i.e.*, bookkeepers, HR managers, etc.) may often be tempted to take advantage of their employers and fellow employees.  With a high-end sentence in a case that has generated public interest, the Court can make clear to would-be fraudsters, thieves, and embezzlers that such crimes will have serious consequences.

4. <u>The need to provide restitution to any victims of the offense.</u>

Fry Foods has submitted a financial impact statement seeking restitution in the amount of $167,347.00.  (ECF No. 34-1 at 7.)  Of this amount, $44,000 is attorney's fees.

A victim's attorney's fees are subject to restitution where they are the direct result of the offense.  In this case, the Government submits that Fry Foods' fees are subject to restitution (i) if they were incurred in investigating the harm caused by the Defendant's conduct, *United States v. Gammell*, 932 F.3d 1175, 1181 (8th Cir. 2019), or (ii) if they were incurred while participating in the Government's investigation, *Lagos v. United States*, 138 S. Ct. 1684, 1688 (2018).

The Government is working with Fry Foods' attorneys to determine the amount of fees, if any, that fall within these two categories, and intends to submit a final number at the sentencing hearing.

Assuming that no attorney's fees are warranted, the Court should order restitution in the amount of $123,347 ($167,347 - $44,000).

B.     **Application of the Guidelines in Imposing a Sentence under 18 U.S.C. § 3553(b).**

The Government's within-guidelines recommendation is based in part on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission, and serves the vital goal of uniformity and fairness in sentencing. The guidelines, formerly mandatory, now serve as one factor among several that courts must consider in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). It remains, however, that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* at 108-09 (internal quotation marks omitted). Thus, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

The guidelines are the sole means available for assuring some measure of uniformity in sentencing, thereby fulfilling a key congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the 3553(a) factors, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. Therefore, "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.

The guidelines deserve significant respect. The Government recognizes that the guidelines are entirely advisory, and that a district court has discretion to vary from an advisory range, subject only to deferential appellate review for reasonableness. A district court, however, must consider the guidelines range, *see* § 3553(a)(4), and is usually well-advised to follow the Sentencing Commission's advice in order to assure fair, proportionate, and uniform sentencing of criminal offenders. Moreover, there are no other 3553(a) factors in this case which mitigate against imposition of a sentence within that range; to the contrary, the 3553(a) factors on balance support the imposition of the recommended guidelines sentence. Accordingly, the Government recommends a within-guidelines sentence of 41 months.

## CONCLUSION

Application of 18 U.S.C. § 3553 supports a sentence of 41 months for the Defendant's offense of wire fraud, mail fraud, and money laundering. The Government submits that a sentence of 8 months is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

Respectfully submitted this 24th day of November, 2021.

RAFAEL M. GONZALEZ, JR.<br>
Acting United States Attorney<br>
By:<br><br>

*/s/ Joshua D. Hurwit*<br>
JOSHUA D. HURWIT<br>
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 24, 2021, the foregoing **UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| | |
|---|---|
| Nicole Owens<br>Federal Defender Services of Idaho<br>702 W. Idaho Street, Suite 1000<br>Boise, ID 83702 | ☐ United States Mail, postage prepaid<br>☐ Fax<br>☒ ECF filing<br>☐ Email |

                                            */s/ Morgan McReynolds*
                                            Legal Assistant